UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

ENRIQUE J. SOMEILLAN,

       Petitioner,

v.                                    Case No:  2:25-cv-01213-JES-DNF

MARKWAYNE MULLIN, SECRETARY,
UNITED STATES DEPARTMENT OF
HOMELAND SECURITY;[1] GARRETT
J. RIPA, FIELD OFFICE
DIRECTOR, UNITED STATES
IMMIGRATION AND CUSTOMS
ENFORCEMENT MIAMI FIELD
OFFICE, ENFORCEMENT AND
REMOVAL OPERATIONS; KEVIN
GUTHRIE, DIRECTOR, FLORIDA
DIVISION OF EMERGENCY
MANAGEMENT; UNITED STATES
IMMIGRATION AND CUSTOMS
ENFORCEMENT; PAMELA J.
BONDI, ATTORNEY GENERAL OF
THE UNITED STATES; TODD M.
LYONS, ACTING DIRECTOR,
UNITED STATES IMMIGRATION
AND CUSTOMS ENFORCEMENT,

       Respondent.

_____

**OPINION AND ORDER**

This matter comes before the Court on Petitioner, Enrique Someillan's, Petition for Writ of Habeas Corpus (Doc. #1) filed on December 26, 2025.  The government filed a Response to Petition (Doc. #8) on January 20, 2026, and Petitioner filed a Reply (Doc.

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Secretary Mullin is automatically substituted for Kristi Noem as of March 23, 2026.

#14) on February 2, 2026.  At the request of the Court (Doc. #17), both sides filed supplements (Docs. ## 18, 20) addressing specific questions of the Court.  For the reasons set forth below, the Petition is granted.

**I.**

Petitioner, Enrique Someillan ("Petitioner" or "Someillan"), Alien #017 360 011, is a 62-year-old male citizen of Cuba and resident of Miami-Dade County, Florida.  Petitioner entered the United States on or about May 2, 1966.  On or about January 12, 1973, Someillan's status was adjusted to lawful permanent resident of the United States as of November 10, 1968, by the agency then-known as the Immigration and Naturalization Service ("INS").

On or about November 5, 1984, Someillan was convicted for possession of cocaine and sentenced to years of probation in Dade County Court, Florida.  On or about July 9, 1992, Petitioner was convicted in the same county for sexual battery and kidnapping and sentenced to six years of imprisonment.  Someillan was released after serving three years of the sentence.

On January 26, 1993, Petitioner was issued a Notice to Appear in connection with his immigration status.  On April 18, 1995, an Immigration Judge ordered Petitioner deported back to Cuba. On July 12, 1996, due to the absence of a repatriation agreement with Cuba and an uncertain time period for deportation, Petitioner was released pursuant to an Order of Supervision.  The Order of

-2-

Supervision required regular reporting with Immigration and Customs Enforcement ("ICE"), and Petitioner complied with that requirement. Additionally, since his release from ICE custody Petitioner was provided employment authorization, has refrained from further criminal activity, and has continued his life with his permanent resident spouse and four United States citizen children.

On December 10, 2025, ICE detained Petitioner without bond. Detention Officer Garcia Ortega signed a Notice of Revocation of Release (the "Notice") that revoked Someillan's January 9, 2005, Order of Supervision.[2] The Notice stated Someillan's supervision was revoked because "[i]t [was] appropriate to enforce [his] removal order." The Notice further stated that ICE had reached this decision after a "thorough review of [his] case and the removal options available at [that] time." ICE provide no further explanation or any factual basis for the revocation. The Notice informed Someillan that he would be provided an informal interview to respond to the — nonexistent — reasons provided in his Notice and to demonstrate that removal is unlikely. The Notice further

---

[2] It appears the January 9, 2005, Order of Supervision was a subsequent order after Someillan's initial July 12, 1996, order. Neither party explained why a new was issued in 2005 or why Someillan's later January 2, 2019, order was not revoked. Further, while Respondents contend that a Supervisory Detention and Deportation Officer signed the Notice, the record does not support that allegation. The Court discusses in more detail below. See infra Section II.C.1.

explained potential future reviews and warned of consequences for preventing or obstructing removal.

Since his current detention, the Department of Homeland Security has actively pursued a third country removal to Mexico. ICE notified Someillan on January 14, 2026, of its intent to remove him to Mexico and subsequently transferred Someillan to Port Isabel Service Processing Center on February 6, 2026.  On February 9, ICE attempted to remove Someillan to Mexico, however Someillan refused to comply.  ICE again attempted to remove Someillan to Mexico on March 4, 2026, but again Someillan did not comply.  Someillan was presented Form I-229(a) warning of the consequences for refusal to comply, but Someillan refused to sign it.

**II.**

Someillan essentially seeks release from custody pursuant to the terms of his 2005 Order of Supervision, asserting that it was improperly revoked.  But before considering the merits of the habeas petition, the Court must determine whether it has jurisdiction to review the petition.  Respondents argue the Court lacks jurisdiction to review Someillan's habeas claims because of 8 U.S.C. § 1252(g) and 8 U.S.C. § 1252(b)(9).  (Doc. #8, pp. 2-5.)  The Court considers each provision in turn.

**A.    Section 1252(g) Does Not Strip the Court of Jurisdiction**

Respondents first argue that § 1252(g) deprives district courts of jurisdiction to review "any claim arising from the

-4-

decision or action to execute removal orders." (Doc. #8, p. 2 (quoting 8 U.S.C. § 1252(g)(internal quotation marks omitted))). Respondents contend that courts have consistently held this provision eliminates subject-matter jurisdiction to review an arrest or detention for the purpose of executing a final removal order. (Id. pp. 2-3.) The Court disagrees.

Respondents' argument is undermined by Supreme Court precedent. In Reno v. American-Arab Anti-Discrimination Committee, the Supreme Court clearly noted that § 1252(g) does not cover the universe of deportation claims but is "much narrower." 525 U.S. 471, 482 (1999). The provision limits the application to three discrete actions: (1) *commencing* proceedings; (2) *adjudicating* cases; and (3) *executing* removal orders. Id. (emphasis in original). There are "many other decisions or actions that may be part of the deportation process," but these do not fall within the discrete exercises of "prosecutorial discretion" covered by § 1252(g). Id. at 482, 489.

Additionally, the Eleventh Circuit held § 1252(g) does not apply where a petitioner brings "a constitutional challenge to his detention." See Madu v. U.S. Att'y Gen., 470 F.3d 1362, 1368 (11th Cir. 2006). Like Respondents in this case, the government in Madu argued that the petitioner's detention challenge arose from the decision to execute a removal order. Id. at 1367-68. The Eleventh Circuit rejected that argument, relying upon Reno to explain that

-5-

where a petitioner is challenging their detention rather than their removal, § 1252(g) does not apply.  Id.

Further, Respondent's cited cases do not support the proposition that Someillan's challenge is against the execution of the removal order.  See Camarena v. Dir., Immigr. & Customs Enf't, 988 F.3d 1268, 1272 (11th Cir. 2021)(holding § 1252(g) barred a court from considering habeas cases "seeking to halt [the petitioners'] removal while they apply for provisional unlawful presence waivers"); Johnson v. Acting U.S. Att'y Gen., 847 F. App'x 801, 802 (11th Cir. 2021)(dismissing a Bivens complaint alleging ICE lacked probable cause to issue a detainer or warrant for his arrest); Gupta v. McGahey, 709 F.3d 1062, 1065 (11th Cir. 2013)(dismissing a Bivens action that alleged ICE agents illegally procured an arrest warrant, arrested plaintiff, and detained plaintiff before removal proceedings could occur); Alvarez v. Immigr. & Customs Enf't, 818 F.3d 1194, 1204-05 (11th Cir. 2016)(dismissing a Bivens action challenging ICE's requirement for the plaintiff to attend removal proceedings and ICE's decision to detain plaintiff during removal proceedings, but finding that a challenge to the indefinite detention does not arise from a decision to execute removal).  The Eleventh Circuit made it clear that when determining whether a claim is barred by § 1252(g) "courts must focus on the action being challenged." Camarena, 988 F.3d at 1272 (quoting Canal A Media Holding, LLC v. U.S.

-6-

Citizenship & Immigr. Servs., 964 F.3d 1250, 1257-58 (11th Cir. 2020). Respondents merely quote the text of the statute from these cases rather than analyze the action being challenged.

Someillan's habeas claims challenge his unlawful *detention* and seek release from detention based on his Fifth Amendment rights. The Court finds § 1252(g) does not "preclude jurisdiction over the challenges to the legality of [a noncitizen's] detention." See Kong v. United States, 62 F.4th 608, 609 (1st Cir. 2023); see also Madu, 470 F.3d at 1368 (finding that where a petitioner is challenging the detention as a denial of his substantive right to due process § 1252(g) does not apply); Ozturk v. Hyde, 136 F.4th 382, 397-98 (2d Cir. 2025)(stating the same); Parra v. Perryman, 172 F.3d 954, 957 (7th Cir. 1999)(similar). Accordingly, § 1252(g) does not bar consideration of the habeas claims.

**B.   Section 1252(b)(9) Does Not Strip the Court of Jurisdiction**

Respondents next argue that § 1252(b)(9) prevents the Court from reviewing "'all questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien from the United States' outside a case reviewing the final removal order." (Doc. #8, p. 4 (quoting 8 U.S.C. § 1252(b)(9))). Respondents contend that Someillan's habeas action seeks "review of an order of removal [or] the decision to seek removal," by effectively

-7-

trying to stop the removal process. (Id. (quoting Dep't of Homeland Sec. v. Regents of Univ. of Cal., 591 U.S. 1, 19 (2020))).

The Supreme Court has foreclosed this argument where the petitioner is "not asking for a review of an order of removal," "the decision . . . to seek removal," or "the process by which . . . removability will be determined." See Dep't of Homeland Sec., 591 U.S. at 19 (quoting Jennings v. Rodriguez, 583 U.S. 281, 294 (2018)(plurality opinion)). Someillan's unlawful detention claims can be resolved without impacting removal — as Someillan himself states, he is not contesting the government's ability to remove him. If the Court were to accept Respondents argument, it would "make claims of prolonged detention effectively unreviewable." Jennings, 583 U.S. at 293.

Further, the Eleventh Circuit held "that the zipper clause only affects cases that involve[] review of an order of removal." See Canal, 964 F.3d at 1257 (quotation marks and citations omitted). Here the Court is only reviewing whether the detention of Someillan is lawful, not the merits of Someillan's removal order. Accordingly, § 1252(b)(9) does not bar consideration of the habeas claims.

## III.

The Court now turns to a merits review of the Petition's claims.

-8-

A.     The Zadvydas Claim is Premature

"Once a noncitizen's order of removal becomes administratively final, the Government 'shall' remove the person within 90 days." Singh v. U.S. Att'y Gen., 945 F.3d 1310, 1313 (11th Cir. 2019)(quoting 8 U.S.C. § 1231(a)(1)(A)). The government must detain the noncitizen during the 90-day removal period, which begins when the removal order becomes administratively final. Id.

Detention may continue after the removal period, but not indefinitely. In Zadvydas v. Davis, the Supreme Court held that "if removal is not reasonably foreseeable, the court should hold continued detention unreasonable and no longer authorized by statute." 533 U.S. 678, 699-700 (2001). If removal is not practically attainable, detention no longer serves its statutory purpose of "assuring the alien's presence at the moment of removal." Id. at 699. The Supreme Court, however, found it unlikely Congress "believed that all reasonably foreseeable removals could be accomplished in [90 days]." Id. at 701. So, "for the sake of uniform administration in the federal courts," it established a "presumptively reasonable period of detention" of six months — the 90-day removal period plus an additional 90 days. Id.

Once the 180 days have passed, courts use a burden-shifting framework to determine the constitutionality of additional post-removal detention. If the noncitizen provides "good reason to

-9-

believe that there is no significant likelihood of removal in the reasonably foreseeable future," then the burden shifts to the government to provide sufficient evidence to show otherwise.  Id.

In calculating the number of days in detention, this Court previously stated, the "reasonable period of confinement . . . commences at the beginning of the removal period."  Perez v. Noem, No. 2:25-cv-00429-JES-NPM, 2025 WL 2306735, at *3 (M.D. Fla. Aug. 11, 2025)(Steele, J.)(citing Akinwale v. Ashcroft, 287 F.3d 1050, 1052 n.3 (11th Cir. 2002)).  This, however, does not mean the Court will count every day since the removal period.  Instead, the Court will only count days a petitioner has been in detention, not days on supervised release.  See, e.g., Tran v. Warden of Fla. Soft Side S. Det. Ctr., No. 2:25-cv-1224-KCD-NPM, 2026 WL 672969, at *3 (M.D. Fla. Mar. 10, 2026).

The Court will aggregate previous periods of detention in calculating the number of days Petition has been in detention.[3] Not aggregating the previous detention periods would effectively

---

[3] To be sure, district courts disagree on whether a court can aggregate previous detention periods for the six-month timeline established by Zadvydas.  Compare Tran, 2026 WL 672969, at *4 (refusing to aggregate all prior detention periods as a categorical rule); Barrios v. Ripa, No. 1:25-cv-22644, 2025 WL 2280485, at *8 (S.D. Fla. Aug. 8, 2025)(declining to aggregate past detention); Meskini v. Att'y Gen. of United States, No. 4:14-cv-42(CDL), 2018 WL 1321576, at *3 (M.D. Fla. Mar. 14, 2018)(same), with Chen v. Holder, No. 6:14-2530, 2015 WL 13236635, at *2 (W.D. La. Nov. 20, 2015)(aggregating past detention periods); Krechmar v. Parra, No. 2:25-cv-01095-SPC-DNF, 2025 WL 3620802, at *3 (M.D. Fla. Dec. 15, 2025)(same); Rodriguez Romero v. Ladwig, No. 25-1106-JWD-EWD, 2026 WL 321437, at *12 (M.D. La. Feb. 6, 2026)(same).

allow ICE to detain noncitizens indefinitely by releasing and re-detaining them every 180 days — a result inconsistent with Zadvydas.  533 U.S. at 682.

Although some courts view aggregation as a "Get Out of Jail Free Card,"[4] such concern is misplaced.  A petitioner still must provide "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future."  Id. at 701.  Without this showing, it does not matter that a petitioner has been detained for more than six-months because no constitutional concern of indefinite detention exists at that time.[5]

Petitioner and Respondent dispute the length of Someillan's detention with ICE.  While Petitioner asserts the detention has exceeded 180 days, Respondents asserts it has only been 139 days since Petitioner was detained beginning December 10, 2025.  After reviewing the supplemental briefings, the Court finds Someillan has not been detained in excess of 180 days.

---

[4] Meskini, 2018 WL 1321576, at *3 (raising concerns of aggregating prior detention resulting in a "Get Out of Jail Free Card"); Flores-Reyes v. Assistant Field Off. Dir., No. 26-cv-20226-ALTMAN, 2026 WL 406708, at *2 (S.D. Fla. Feb. 13, 2026)(same).

[5] The government's burden under Zadvydas is not so onerous as to create a "Get Out of Jail Free Card."  Courts are still prohibited from second guessing the government's execution of the removal order and the government can likely prevail with evidence that the government is actively negotiating with a foreign government to facilitate a petitioner's removal.

The record before the Court reflects only one period of detention, beginning on December 10, 2025. While the Final Removal Order was issued in 1995, Petitioner points to no evidence in the record establishing detention then. Instead, the record reflects that Someillan has been on Order of Supervision since July 12, 1996. The Court cannot aggregate any time periods where Someillan has not shown he was in detention and thus can only rely upon his detention beginning on December 10, 2025. As of the date of this Opinion and Order, it has only been 139 days — thereby within the reasonable period of detention.[6]

Accordingly, Someillan's Zadvydas action is premature. See Akinwale, 287 F.3d at 1051-52.

**B.   ICE Violated Its Own Regulations in Detaining Someillan**

The regulations governing immigration and removal proceedings afford crucial procedural safeguards to detainees. See United States v. Caceres, 440 U.S. 741, 760 (1979)(Marhsall, J., dissenting)(discussing how the Supreme Court previously held where

---

[6] Additionally, the removal period may be extended "if the alien . . . conspires or acts to prevent the alien's removal subject to an order of removal." 8 U.S.C. § 1231(a)(1)(C). The concern of indefinite detention does not exist where "an alien is the cause of his own detention," as the alien "has the keys [to his freedom] in his pocket." See Pelich v. INS, 329 F.3d 1057, 1060 (9th Cir. 2003)(internal quotation marks and citations omitted); see also Akinwale, 287 F.3d at 1052 n.4 (stating an alien's actions that thwart repatriation efforts toll the removal period); Lema v. INS, 341 F.3d 853, 856-57 (9th Cir. 2003)(same). Someillan's actions on February 9 and March 4, 2026, in refusing to be removed to Mexico likely tolled the period, again rendering Someillan's Zadvydas claim premature.

an agency adopts regulations as procedural safeguards they must follow them).    For Someillan's continued detention to be constitutional, the government must comply with its own regulations. Id.  Someillan asserts two claims based on alleged violations of applicable regulations: (1) ICE improperly revoked his Order of Supervision; and (2) Someillan was deprived of the opportunity to meaningfully challenge the revocation.  The Court considers each of these challenges in turn.

**(1)    The Revocation of Someillan's Order of Supervision**

Someillan argues that the government violated his due process rights by allowing his Order of Supervision to be revoked by an individual who had not been delegated authority to revoke the Order of Supervision.  (Doc. #1, ¶ 66.)  Respondents contend that ICE complied with its regulations because the Supervisory Detention and Deportation Officer was properly delegated authority to revoke Someillan's Order of Supervision. (Doc. #8, pp. 7-9.)  The Court agrees with Someillan.

Once an individual is released from detention under an order of supervision, revocation of that release is subject to the provisions of 8 C.F.R. § 241.4(*l*).  The full text of this provision states:

(*l*) Revocation of release—

(1) Violation of conditions of release. Any alien described in paragraph (a) or (b)(1) of this section who has been released under an order of supervision or other

conditions of release who violates the conditions of release may be returned to custody. Any such alien who violates the conditions of an order of supervision is subject to the penalties described in section 243(b) of the Act. Upon revocation, the alien will be notified of the reasons for revocation of his or her release or parole. The alien will be afforded an initial informal interview promptly after his or her return to Service custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification.

(2) Determination by the Service. The Executive Associate Commissioner shall have authority, in the exercise of discretion, to revoke release and return to Service custody an alien previously approved for release under the procedures in this section. A district director may also revoke release of an alien when, in the district director's opinion, revocation is in the public interest and circumstances do not reasonably permit referral of the case to the Executive Associate Commissioner. Release may be revoked in the exercise of discretion when, in the opinion of the revoking official:

(i) The purposes of release have been served;

(ii) The alien violates any condition of release;

(iii) It is appropriate to enforce a removal order or to commence removal proceedings against an alien; or

(iv) The conduct of the alien, or any other circumstance, indicates that release would no longer be appropriate.

(3) Timing of review when release is revoked. If the alien is not released from custody following the informal interview provided for in paragraph (l)(1) of this section, the HQPDU Director shall schedule the review process in the case of an alien whose previous release or parole from immigration custody pursuant to a decision of either the district director, Director of the Detention and Removal Field Office, or Executive Associate Commissioner under the procedures in this section has been or is subject to being revoked. The

-14-

normal review process will commence with notification to the alien of a records review and scheduling of an interview, which will ordinarily be expected to occur within approximately three months after release is revoked. That custody review will include a final evaluation of any contested facts relevant to the revocation and a determination whether the facts as determined warrant revocation and further denial of release. Thereafter, custody reviews will be conducted annually under the provisions of paragraphs (i), (j), and (k) of this section.

8 C.F.R. § 241.4(*l*)(1)-(3).

Thus, revocation of an order of release is limited to the Executive Associate Director and, sometimes, a District Director. 8 C.F.R. § 241.4(*l*)(2). Additionally, § 241.4(c)(4) provides:

All references to the Executive Associate Commissioner, the Director of the Detention and Removal Field Office, and the district director in this section shall be deemed to include any person or persons (including a committee) designated in writing by the Executive Associate Commissioner, the Director of the Detention and Removal Field Office, or the district director to exercise powers under this section.

8 C.F.R. § 241.4(c)(4).

Although Respondents contend the Notice was signed by a "Supervisory Detention and Deportation Office," the signature matches the signature of Garcia Ortega, D.O. ("Officer Ortega"), the interviewing ICE officer in Someillan's informal interview. (Doc. #8, p. 9; Doc. #11-1, pp. 4, 6.) Since Officer Ortega's position is identified as Detention Officer or "D.O.," the memorandum provided by Respondents regarding the "Delegation of

-15-

Signature Authority" establishes that Officer Ortega lacked the authority to sign the Notice. (Doc. #11-1, pp. 9-10.) Respondents have not established there is any written designation of Officer Ortega as an authorized decisionmaker. As such, ICE failed to comply with its own regulations and violated Someillan's procedural due process rights when an unauthorized employee revoked Someillan's Order of Supervision.

**(2)   Due Process Rights Required by ICE Regulations Upon Revocation of Release**

Someillan next argues that his due process rights were violated when ICE failed: (1) to make an individualized determination as to whether he was a danger to the community or flight risk; (2) to conduct an interview with Someillan to respond to the reasons ICE revoked his Order of Supervision; and (3) to provide the reasons for the revocation of his Order of Supervision. Respondents do not dispute such failures, and the record establishes that Respondents failed in all three areas. Respondents argue, however, that these are requirements of only § 241.4(*l*)(1), while ICE revoked Someillan's Order of Supervision under § 241.4(*l*)(2). Therefore, Respondents argue, ICE was not required to provide "notice, explanation, or an interview for the alien to respond." (Doc. #8, p. 7.) Someillan responds that ICE must comply with(*l*)(1) and (*l*)(2). (Doc. #1, ¶¶ 66, 68.) Again, the Court agrees with Someillan.

-16-

### (a)   The Requirements of (*l*)(1) Apply to (*l*)(2)

When interpreting agency regulations, district courts must "carefully consider the text, structure, history, and purpose of [the] regulation, in all the ways it would if it had no agency to fall back on."   See Kisor v. Wilkie, 588 U.S. 558, 575 (2019)(cleaned up).   In determining the plain meaning of the regulation, the Court looks at the entire regulatory context.   CBS Broad. Inc. v. Echostar Commc'ns Corp., 532 F.3d 1294, 1301 (11th Cir. 2008)).

"Revocation of release" is governed by 8 C.F.R. § 241.4(*l*). Subparagraph (*l*)(2), titled "Determination by the Service," provides four situations in which "[r]elease may be revoked in the exercise of discretion[:]"

> (i)     The purposes of release have been served;
> (ii)    The alien violates any condition of release;
> (iii)   It is appropriate to enforce a removal order or to commence removal proceedings against an alien; or
> (iv)    The conduct of the alien, or any other circumstance, indicates that release would no longer be appropriate.

8 C.F.R. § 241.4(*l*)(2).   Sub-paragraph § 241.4(*l*)(1), titled "Violation of conditions of release," provides that "an alien will be notified of the reasons for revocation" and "be afforded an initial informal interview . . . to respond to the reasons for the revocation stated in the notification." Id. § 241.4(*l*)(1).   If the alien is not released following

-17-

the informal interview provided by sub-paragraph (*l*)(1), a review process is scheduled "under the procedures in this section." Id. § 241.(*l*)(3).   This review includes a record review, an interview with the alien, a final evaluation of any contested relevant facts, and a determination whether the facts warrant revocation and denial of release.  Id.

Under Respondents' reading, individuals who have their order of supervision revoked under (*l*)(2) — except for (*l*)(2)(ii)[7] — would not be entitled to any custody review outlined in (*l*)(3). Yet the description of the custody review process in the regulation is clearly designed to target the crucial constitutional concern in Zadvydas – indefinite detention.[8]  See 8 C.F.R. §§ 241.4(d)-(f).

Additionally, ICE only recently changed its view as to the very limited scope of review.  Funes v. Francis, 810 F. Supp. 3d 472, 492-93 (S.D.N.Y. 2025); Zhu v. Genalo, 798 F. Supp. 3d 400,

---

[7] The Court infers Respondents would not argue that an individual who has their order of supervision revoked under (*l*)(2)(ii) is not entitled to an informal interview simply because ICE opted to utilize (*l*)(2)(ii) rather than (*l*)(1).   Such contention would undermine Respondents' argument as it would permit the government to render an entire subparagraph of its own regulations meaningless and toothless.
[8] This formalistic reading would effectively strip all but one category of aliens of procedural safeguards that the agency created.   This potentially raises constitutional concerns, as, if Respondents' reading of the regulation is correct, the government can effectively prevent all aliens from having notice and opportunity to be heard by revoking under (*l*)(2)(i), (*l*)(2)(iii), or (*l*)(2)(iv).  This, however, is not before the Court and the Court makes no comment as to the constitutionality of such regulation.

-18-

408-14 (S.D.N.Y. 2025); Ceesay v. Kurzdorfer, 781 F Supp. 3d 137, 163 (W.D.N.Y. 2025)(citations omitted). The notices of revocation provided to noncitizens originally cited paragraph (*l*) generally; however, they now cite (*l*)(2) specifically. Even with this more specific citation, the notices still inform noncitizens that they will be given an informal interview and subsequent custody review. (Doc. #11-1, pp. 4, 6.) An agency's practice of notifying noncitizens of the informal interview and subsequent custody reviews reflects the understanding of officials capable of dictating the authoritative policy and thereby aids in interpreting the regulation. See Christopher v. SmithKline Beecham Corp., 567 U.S. 142, 167-68 (2012)(declining to accept an agency's formalistic interpretation after being contradicted by the agency's previous practice).

Finally, other courts have applied the procedural requirements in (*l*)(1) to (*l*)(2). See Funes, 810 F. Supp. 3d at 493-94; Perez-Escobar v. Moniz, 792 F. Supp. 3d 224, 225-26 (D. Mass. 2025); Gutnik v. Bondi, No. 5:26-cv-00908-WLH-ACCV, 2026 WL 700546, at *2 (C.D. Cal. Mar. 5, 2026); Banega v. Warden of Soft Side S. Facility, No. 2:25-cv-1152-JES-DNF, 2026 WL 234042, at *3-4 (M.D. Fla. Jan. 29, 2026)(Steele, J.); Grigorian v. Bondi, -- F. Supp. 3d --, No. 25-CV-22914-RAR, 2025 WL 2604573, at *6-7 (S.D. Fla. Sept. 9, 2025); see also Noem v. Abrego Garcia, 604 U.S. --, 145 S. Ct. 1017, 1019 (2025)(Sotomayor, J., statement)(describing

-19-

8 C.F.R § 241.4(*l*) as requiring the government to provide notice and an informal interview).  Therefore, the Court will now consider whether ICE complied with its obligations.

### (b)  ICE Failed to Provide Someillan with Adequate Notice

There is some evidence to suggest that at least some kind of informal interview took place. The only evidence presented is a signed document stating Someillan provided no written statement or documents.  (Doc. #11-1, p. 6.)  But Someillan had been provided with no reasons for the revocation of his release, only that ICE found it "appropriate to enforce your removal order."  (Doc. #11-1, pp. 4, 6.)  No facts were given in support of this stated ground for revocation of release.

Given that Someillan's informal interview was on the same day as his Notice, it is hard to imagine how Someillan would have been prepared to either provide documents or a written statement to refute the missing facts.  The conclusory statement lacks the sufficiency to "apprise the affected individual of, and permit adequate preparation for," the opportunity to be heard.  <u>See</u> <u>Memphis Light, Gas & Water Div. v. Craft</u>, 436 U.S. 1, 13 (1978); <u>see</u> <u>also</u> <u>Perez-Escobar</u>, 792 F. Supp. 3d at 226 (finding that asserting "it is appropriate to enforce the removal order" is insufficient notice).  Regardless of Someillan's status as a

noncitizen, ICE is obligated to provide him procedural due process rights during its process, but failed to do so in this case.

### C.   Given the Due Process Violations, Someillan Is Entitled to Release

The Court finds ICE failed to comply with its regulations and with procedural due process, and therefore, Someillan is entitled to release subject to the terms of the Order of Supervision.[9]  If Someillan violates the conditions of release, he may be subject to penalties — including further detention.  See 8 U.S.C. § 1253(b); Zadvydas, 533 U.S. at 695 ("[W]e nowhere deny the right of Congress . . . to subject [aliens] to supervision with conditions when released from detention, or to incarcerate them where appropriate for violations of those conditions").

Additionally, if removal becomes likely in the reasonably foreseeable future, ICE can re-detain Someillan to "assur[e his] presence at the moment of removal," assuming procedural safeguards are followed.  Zadvydas, 533 U.S. at 680.

Accordingly, it is now

**ORDERED:**

(1)  Enrique J. Someillan's Petition for Writ of Habeas Corpus (Doc. #1) is **GRANTED.**

---

[9] Since the Court grants Petitioner's Fifth Amendment claims, it does not address the remaining claims.  See Banks v. Dretke, 540 U.S. 668, 689 n.10 (2004)(declining to address an additional claim in a habeas petition after granting relief on another claim because "any relief [petitioner] could obtain on that claim would be cumulative").

-21-

(2)   Respondents shall release Someillan within 24 hours of this Order, and they shall facilitate his transportation from the detention facility by notifying his counsel when and where he can be collected.  Someillan's release shall be subject to the terms of the Order of Supervision previously imposed.

(3)   The Clerk is **DIRECTED** to terminate any pending motions and deadlines, enter judgment, and close this case.

**DONE AND ORDERED** at Fort Myers, Florida, this __28th__ day of April 2026.

_____
JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies:
Parties of record

-22-